IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 7:12-CV-107-FL

| | | |
|---|---|---|
| WILLIAM BURCH AND STEFFANIE BURCH, | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | ORDER |
| LITITZ MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

This matter, brought by alleged, aggrieved policy holders against the insured, asserting claims of contract breach, bad faith, and unfair claim settlement practices, is before the court on defendant's motion for summary judgment. (DE 22). Defendant asserts entitlement to judgement as a matter of law. In the alternative, defendant requests that the court enter summary judgment on plaintiffs' claims for treble damages, punitive damages, attorney's fees, emotional distress, and lost wages or earning capacity. The issues raised are ripe for disposition. For the following reasons, the court grants in part and denies in part defendant's motion.

**STATEMENT OF THE CASE**

Plaintiffs, then residents of North Carolina, filed complaint against defendant, a Pennsylvania corporation, in the General Court of Justice, Superior Court Division of Robeson County, North Carolina on March 16, 2012. Complaint alleges claims arising out of a homeowners' insurance policy issued by defendant, specifically breach of contract, breach of the covenant of good faith and fair dealing, and unfair and deceptive trade practices in violation of North Carolina General Statutes

§§ 58-63-15(11) and 75-1.1. Plaintiffs also seek reasonable attorney's fees, treble damages, compensatory damages, prejudgment interest on the compensatory award and post-judgment interest on the final judgment. (DE 1). Although not formally stated in their complaint, plaintiffs indicate that they seek consequential damages related to impaired credit and loss of employment. (DE 23-3 ¶ 2, DE 24 at 10).

On August 19, 2011, defendant removed the case to federal court pursuant to 28 U.S.C. §1441, *et. seq,* because the parties had diversity of citizenship and the amount in controversy exceeded $75,000, pursuant to 28 U.S.C. § 1332.[1] (DE 1). Defendant has counterclaimed against plaintiffs. It seeks to recover $53,970.25 for sums previously paid to plaintiffs and $190,000 paid to the holder of the mortgage on plaintiffs' home. (DE 5).

On April 26, 2013, defendant filed the instant motion for summary judgment pursuant to Rule 56. (DE 22, DE 23). Defendant relies on affidavit of a supervisor in defendant's underwriting department, Charles A. Michael, Jr. (DE 22-1); deposition of Michael (DE 23-1), and examination of plaintiff Steffanie Burch (DE 23-2), together with plaintiffs' responses to defendant's interrogatories and request for production of documents (DE 23-3). Plaintiffs rely in opposition to the motion upon asserted admissions by Michael. Premised on those, plaintiffs assert there are genuine issues for trial. (DE 24).

---

[1] While Section 1332(c)(1) deems corporations to be a citizen of the same state as the insured, this subsection does not apply to actions by the insured against the insurer based on its independent wrongs. Searles v. Cincinnati Ins. Co., 998 F.2d 728, 729-30 (9th Cir. 1993); Corn v. Precision Contr., 226 F. Supp. 2d 780, 782 (W.D.N.C. 2002). Thus, defendant is not be deemed a citizen of North Carolina and diversity citizenship exists in this case.

The court also notes record evidence that plaintiffs have now relocated to Texas. (DE 23-3, p. 2). However, "For purposes of federal jurisdiction, the requirement of diversity of citizenship is ordinarily determined by the situation existing at the time the action is commenced. Once federal jurisdiction has attached, it is not defeated by a subsequent change in the citizenship of one of the parties." Grady v. Irvine, 254 F.2d 224, 226 (4th Cir. 1958).

## STATEMENT OF UNDISPUTED FACTS

The relevant, undisputed facts are as follows. In 2010, plaintiffs purchased a home on 108 West Graham Street in Maxton, Robeson County, North Carolina. (DE 5, ¶ 5). On July 23, 2010, plaintiff Steffanie Burch visited her insurance agent, Insurance Service Center in Fayetteville, North Carolina, and signed an application for a homeowner's policy to insure the home. (DE 5-1, Exhibit A. See attached as Addendum A hereto.). The application consists of two pages, with various blocks requesting certain information. The block labeled "MARITAL STATUS" under the applicant's information is completed with the letter "S." Beneath the block labeled "MARKET VALUE," the amount of "$475,000" appears. The block labeled "PURCHASE DATE/PRICE" likewise provides "7/23/10 $475,000." Beneath the block labeled "REPLACEMENT COST," the number $526,000 appears. A row for "LOSS HISTORY" includes the question: "ANY LOSSES, WHETHER OR NOT PAID BY INSURANCE, DURING THE LAST 3 YEARS, AT THIS OR AT ANY OTHER LOCATION?" To the right of this question, a box marked "NO" is checked. Several blocks have been left blank, including a number under the section marked "RATING/UNDERWRITING" which request details about the unit and the surrounding area. (*Id.*).

At the bottom of the application, Plaintiff Steffanie Burch signed a statement providing that

> I HAVE READ THE ABOVE APPLICATION AND ANY ATTACHMENTS. I DECLARE THAT THE INFORMATION IN THEM IS TRUE, COMPLETE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF. THIS INFORMATION IS BEING OFFERED TO THE COMPANY AS AN INDUCEMENT TO ISSUE THE POLICY FOR WHICH I AM APPLYING.

(DE 5-1, 2).

The insurance agent submitted the application to defendant, which initially issued a policy providing that property losses would be settled "at actual cash value at the time of loss but not more than the amount required to repair or replace." (DE 5-1, Exhibit B, p. 13). Buildings would be

3

covered "at replacement cost without deduction for depreciation," subject to a number of conditions. (*Id.*).

The policy also states that:

We provide coverage to no "insureds" under this policy if, whether before or after a loss, an "insured" has:
1. Intentionally concealed or misrepresented any material fact or circumstance
2. Engaged in fraudulent conduct; or
3. Made false statements;
relating to this insurance.

(DE 5-1, Exhibit B, pp. 15-16).

Initially, the policy provided coverage on the replacement cost of $526,000. After defendant hired a third party to inspect the premises, the third party determined the replacement cost of the home to be $807,000. Based on this information, defendant increased the coverage to $645,000, and also increased the premium accordingly. (DE 23, p. 2; DE 23-1, pp. 54-55).

On August 14, 2011, a fire destroyed the home, consuming plaintiffs' personal property and forcing them to make alternative living arrangements. (DE 5, p. 1). Plaintiffs made a claim under their policy, and defendant provided financial assistance for the plaintiffs to secure a temporary residence while it investigated the claim. (DE 5, p. 3). As noted, payments made to or on behalf of plaintiffs totaled the sum of $243,970.25. (DE 5, p. 4). On February 15, 2012, defendant informed the plaintiffs that it had denied their claim. (DE 1-1, ¶ 15; DE-5, ¶15). Plaintiffs have demanded unspecified compensatory and contractual damages related to the breach, along with extra-contractual damages. (DE 1, DE 24, p. 9).

## DISCUSSION

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to find for the non-moving party). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

Summary judgment is not a vehicle for the court to weigh the evidence and determine the truth of the matter, but to determine whether a genuine issue exists for trial. Anderson, 477 U.S. at 249. Similarly, credibility determinations are jury functions, not those of a judge. Id. at 255. The court must view the inferences drawn from the underlying facts in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247-48. Accordingly, the court must examine the materiality and the genuineness of the alleged fact issues in ruling on this motion. Id. at 248-49.

A.  Breach of Contract

Plaintiffs assert that defendant breached its policy obligations when it denied their claim. Defendant asserts an affirmative defense of material misrepresentation and argues that there is no genuine issue of material fact that it will prevail.

As the court acts on this case asserting diversity jurisdiction, it is bound to enforce the settled

5

laws of North Carolina. Kline v. Wheels by Kinney, Inc., 464 F.2d 184, 187 (4th Cir. 1972). Under North Carolina law, an insurance company may prevail on an affirmative defense of material misrepresentation if the insured made statements that were: 1) false; 2) knowingly and willfully made, and 3) material. Bryant v. Nationwide Mut. Fire Ins. Co., 313 N.C. 362, 370 (1985).

    1.    Falsity

On November 8, 2012, defendant conducted an examination of plaintiffs under oath. The examination included discussion of the application. Defendant's counsel questioned Steffanie Burch about the marital status block:

```
Q    Why would you have put "S" there?
A    I have no clue.  I may have just overlooked that, 'cause that's evidently not
     true.
```
(DE 23-2, p. 38)

Steffanie Burch was asked about the home's purchase price. She admitted that the price "was around two [hundred thousand] ten." Further questions were posed to her:

```
Q    Do you know where that four hundred and seventy-five came from?
A    I have no idea.  Just looking, I would have thought that that's the market
     value, or–
Q    Right.  But here's it's got a block for market value.
A    Yeah.  It's got that same price.
Q    And then—then this says 'purchase date and price, 7-23-10.'
A    Yeah.  I'm not sure.
```
(DE 23-2, p. 38-39).

Steffanie Burch stated that the family had made a prior insurance claim in 2009 under her renter's policy. As described, this prior claim does not appear in the application's block for "LOSS HISTORY." Steffanie Burch stated that when plaintiffs had obtained a loan to pay for the house they had used only her name "Because of the liens and stuff on [William's] credit." (DE 23-2, p. 32). She also stated that she is listed alone as the director of a foundation her husband had

6

established, "because as a female, you get better tax breaks, I guess–I don't know–for business." (DE 23-2, pp. 105-106).

Plaintiffs do not dispute that several blocks on the application contain false information. Plaintiffs expressly acknowledge that "there was a mistake on the block requesting information regarding the applicant's marital status." (DE 24, p. 3). Regarding the omission of prior loss claims, plaintiffs state that they did not list any losses because they had not made any claims "pursuant to any homeowner's policy," and attempt to distinguish the 2009 claim as one made "under the provisions of a *renter's* policy." (*Id.*) (*emphasis added*). This implicitly acknowledges the falsity of the statement.

Regarding the purchase price question, plaintiffs concede that the prices were listed at $475,000. (*Id.*) While plaintiffs do not admit defendant's assertion that the purchase price was $200,000, they assert that the application was "prepared in advance (and presumably by e-mail) with the assistance of an independent insurance agent representing Lititz Mutual," and proceed to argue whether the purchase price was material. (DE 24, p. 3-5). Plaintiffs thereby implicitly acknowledge that the application also misrepresented the home's purchase price.

Rather than premise their arguments on falsity, plaintiffs argue that the misrepresentations were either not knowingly or willfully made, or immaterial.

2. Knowingly and Willfully Made

As noted above, plaintiffs' assertions that they misinterpreted the loss history question, and that defendant's insurance agent prepared the documents in advance, address the issue of whether they made the false statements "knowingly and willfully."

North Carolina law is settled that a plaintiff who signs an insurance application represents

7

that she has read the application and affirmed its truth. Goodwin v. Investors Life Ins. Co., 332 N.C. 326, 331 (1992). In Goodwin, the North Carolina Supreme Court held that a plaintiff must be bound by her signature on a driver's insurance policy for her husband, despite her claim to be unaware that the agent inaccurately responded to a question concerning her husband's driving record. "It made no difference whether the plaintiff knew what was in the agreement or not. He signed it, and the law presumes he did know what was in it, and he will not be heard, in the absence of any proof of fraud or mistake, to say that he did not." Goodwin 332 N.C. at 331 (citation and punctuation omitted). Even if defendant or the insurance agent committed some form of mistake, negligence or fraud, the North Carolina Supreme Court found that the plaintiffs might not necessarily prevail:

> The rule that the insured is not responsible for false answers in the application where they have been inserted by the agent through mistake, negligence, or fraud is not absolute, and applies only if the insured is *justifiably ignorant* of the untrue answers, *has no actual or implied knowledge* thereof, and has been guilty of no bad faith or fraud.

Goodwin v. Investors Life Ins. Co., 332 N.C. 326, 330 (N.C. 1992)

The North Carolina Court of Appeals ruled on a case with facts close to the present dispute in Bell v. Nationwide Ins. Co., 146 N.C. App. 725 (2001). There, defendant denied a fire insurance claim because plaintiffs misrepresented that they had filed bankruptcy, had a policy canceled or not renewed, and had past losses. Plaintiffs argued that the defendant's agent had failed to ask them these questions. The North Carolina Court of Appeals granted defendant's motion for summary judgment, stating that:

> Our Supreme Court has held if an application for insurance containing material misrepresentations is filled in by the agent before being signed by the applicant, these are material misrepresentations of the applicant which bar recovery.

Bell, 146 N.C. App. at 728 (citing, *inter alia* Inman v. Woodmen of the World, 211 N.C. 179 (1937)).

8

Plaintiffs suggest that Steffanie Burch interpreted the claims history question to seek information on previous *homeowner* policy claims, rather than claims on a *renter's* policy. This error may represent a "mistake" that would excuse the misrepresentation. Goodwin, 332 N.C. at 330-331 (noting that proof of "mistake" may mean that the misrepresentation was not knowing or willful); see also Koger Mgmt. Group v. Cont'l Cas. Co., No. 1:08-cv-301, 2009 U.S. Dist. LEXIS 18620, *14 (E.D. Va. March 3, 2009)("If the insured misinterprets a question, but answers it truthfully based on his understanding of the question, he has not knowingly given a false answer."). Assessing the credibility of this misunderstanding would thus properly fall to a jury.

Plaintiffs have not alleged a similar mistaken understanding regarding the purchase price information, or Steffanie Burch's marital status. Nor have they offered any evidence to suggest that the agent who completed the application somehow acted with deception or in bad faith. In the absence of such proof, the court must consider plaintiff's signature to represent a "knowing and willful" misrepresentation of these facts. Goodwin, 332 N.C. at 331 ("He signed it, and the law presumes he did know what was in it, and he will not be heard, in the *absence of any proof* of fraud or mistake, to say that he did not.)(*emphasis added*).

3. Materiality

Despite the fact that Burch's answers regarding marital status and prior claim history were false and knowingly made, defendant does not provide evidence or argument to establish their materiality. Instead, defendant's motion for summary judgment focuses solely on the materiality of the purchase price. To support its argument, defendant provides an affidavit and deposition testimony from Charles A. Michael Jr., the Personal Lines Supervisor in Lititz's underwriting department.

9

In his affidavit, Michael stated that defendant "will not issue policies where the replacement cost exceeds the purchase price by more than 30% absent extenuating circumstances such as a below market price sale between family members." (DE 22-1, ¶12). According to Michael, such large discrepancies create additional risk. (*Id.*, ¶13).

Michael said defendant will not write a policy in cases "where there is a disparity...between a replacement cost and the market value."[2] (DE 23-1, pp. 88-89). However, plaintiff's counsel noted that several application blocks lacked any response at all, including some that might seem important to the event of a fire such as the number of fireplaces in the home. Plaintiff's counsel asked whether "hard and fast rules" existed to determine which application blocks were material. Michael admitted that defendant did not have "hard and fast rules," and lacked written guidelines that would provide more information regarding "materiality," stating that "each claim is going to be settled on a case-by-case basis," (DE 23-1, p. 98, 100, 102-103). Even regarding matters of a low purchase price, Michael admitted that there would be some instances where "we would look at the situation," offering the specific example of a "family to family transfer." (DE 23-1, p. 90). However, he maintained that the purchase price was "a very important component" of underwriting and that a "significant" disparity between purchase price and replacement cost would lead the company to deny coverage. (DE 23-1, p. 102, 106).

Michael provided the following explanation for why defendant considered purchase price important:

---

[2] In his deposition, Michael testified that defendant defines market value as "the sales price if it's a recent sale," and that the application labeled this term "purchase date and price." (DE 23-1, pp. 58-59). Defendant has provided no argument or evidence indicating that a misrepresentation of "market value" should be analyzed differently than a misrepresentation of "purchase price." Thus, the court does not conduct a separate analysis of any market value misrepresentation, and Michael's references to market value shall be considered to be references to the purchase price.

10

> Our guideline, the type of business we're looking for, you know, our market is homes that [market value and replacement cost] are very close together because we don't have specialty programs in place for the functional replacement costs and all these different forms that may or may not be able to insure a home where there is a huge difference.

(DE 23-1, p. 89).

Also in his deposition, Michael testified that the original premium of the policy was set at $2,437.00 and increased to $2,923.00 after inspection. Yet, he testified that the only reason for the premium change was the increase in the defendant's assessment of the home's replacement cost. (DE 23-1, p. 74). Plaintiffs argue that Michael's statements demonstrate inconsistency and that the lack of documented guidelines undermine defendant's claims of materiality.

A "material" misrepresentation is one in which "the knowledge or ignorance of it would naturally influence the judgment of the insurer in making the contract, or in estimating the degree and character of the risk, or in fixing the rate of premium." Goodwin, 332 N.C. at 331. The test is subjective, considering whether the false answer would affect the insurance company "in deciding for itself, and in its own interest." Id. Courts consider whether there is a "strong logical relationship between the question asked, assessing the risk, and the ultimate determination of an actuarially sound premium." Goodwin, 332 N.C. at 332; see Johnson v. Household Life Ins. Co., No. 5:11-CV-301-BR, 2012 U.S. Dist. LEXIS 154189, at *19 (E.D.N.C. October 26, 2012).

The United States Supreme Court has noted that

> [D]iscredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion. Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery. We repeat, however, that the plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial.

11

Anderson, 477 U.S. at 256-257 (internal punctuation and citations omitted).

The Fourth Circuit has recognized the principle that "[s]ummary judgment is seldom appropriate in cases wherein particular states of mind are decisive elements of a claim or defense." Miller v. Federal Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). The rationale, it explained, "is that determinations of intent frequently depend upon the credibility of witnesses." Id. Thus, the Fourth Circuit has found summary judgment inappropriate on issues such as whether a seller of stock breached warranties based on "the best of [the warrantor's] knowledge." Magill v. Gulf & Western Industries, Inc., 736 F.2d 976 (4th Cir. 1984). Similarly, summary judgment was denied in the matter of contract formation that involved "subjective states and objective manifestations of intention...traditionally understood to be for the trier of fact." Charbonnages de France v. Smith, 597 F.2d 406, 414-415 (4th Cir. 1978).

Here, the court finds that a genuine issue of material fact exists on the question of the materiality. For example, the question of whether the home's low purchase price would have influenced defendant in forming the contract, assessing risk, or fixing the premium raises an issue regarding the defendant's state of mind. Unfortunately, the record on this appears underdeveloped.

Michael testified that the bulk of application responses are evaluated on a "case-by-case basis." (DE 23-1, p. 98, 100, 102-103). While he repeatedly stated that defendant would not have issued the policy to plaintiffs based on the purchase price, he did allow that even if the house had been purchased for a sum significantly less than $475,000, defendants "would look at the situation." (DE 23-1, p. 90). In noting that defendant had adjusted premiums after reassessing replacement cost, Michael's testimony established that the home's replacement cost could affect premiums, but did not address how the purchase price might affect that calculation. Furthermore, defendant offered

12

no facts or clear explanation to support Michael's affidavit statement that "a large discrepancy between the purchase price and replacement cost creates additional risk." (DE 22-1, ¶ 13). Defendant provided no documentation of its own prior practice or established policies, nor did it offer any evidence of general industry practice. Its evidence rested entirely on the testimony of an employee, the full message of which seems somewhat confused.

Plaintiffs' evidence showing the defendant's failure to honor the policy and noting Michael's inconsistencies is enough – even if slight – to permit a jury to conclude that plaintiffs' misrepresentation may not have been "material" and to return a verdict in their favor. Defendant's motion directed towards breach of contract claim is denied.

B.      Bad Faith

Plaintiffs claim defendant breached its covenant of good faith and fair dealing. To show bad faith, plaintiffs must prove (1) refusal to pay after recognition of a valid claim, (2) bad faith, and (3) aggravating or outrageous conduct. Topsail Reef Homeowners Ass'n v. Zurich Specialties London, LTD, 11 Fed. Appx. 225, 237 (4th Cir. 2001)(citing Lovell v. Nationwide Mut. Ins. Co., 108 N.C. App. 416 (1993)); Cleveland Construction, Inc. v. Fireman's Fund Insurance Company, 819 F.Supp.2d 477, 483 (W.D.N.C. 2011). Claims of bad faith "cannot rest merely on honest disagreement or innocent mistake." ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co., 472 F.3d 99, n. 32 (4th Cir. 2006). North Carolina law defines "aggravated conduct" to include "fraud, malice, gross negligence, insult, . . . wilfully, or under circumstances of rudeness or oppression, or in a manner which evinces a reckless and wanton disregard of the plaintiff's rights." Baker v. Winslow, 184 N.C. 1, 5 (1922).

Plaintiffs cannot satisfy the first element of a bad faith claim because defendant never

13

recognized a valid claim – indeed, this claim remains under dispute. See Blis Day Spa, LLC v. Hartford Ins. Group, 427 F. Supp. 2d 621, 632-633 (W.D.N.C. 2006). Furthermore, there is no evidence that this dispute rests on anything more than an "honest disagreement." Defendant has articulated a reasonable explanation for its refusal to honor the policy, based on plaintiffs' numerous misstatements in its application. The actions plaintiff cites as "outrageous" – a six-month investigation, out-of-court settlement offers, examination of the plaintiffs under oath – are fully consistent with a good faith effort to determine whether a claim is valid and mitigate litigation costs. Aside from conclusory statements, plaintiff offers no evidence of outrageous conduct and there is no genuine issue of material fact on the claim of good faith and fair dealing. Plaintiff's bad faith claim is dismissed, where summary judgment is granted in favor of defendant.

C.     Unfair Claim Settlement Practices

North Carolina provides two statutes applicable to unfair claim settlement practices. The state's insurance law provides that insurance companies engage in "unfair trade practices" in the settlement context when engaging in actions such as misrepresenting pertinent facts or insurance policy provisions, failing to adopt and implement reasonable standards for the prompt investigation of claims, attempting to settle a claim for less than the amount that a reasonable man would have believed he was entitled, and other activities involving clear acts of abuse. N.C.G.S. §58-63-15 (11). However, this provision does not in itself create a cause of action. Rather, a plaintiff's remedy for violations of this statute is the filing of a claim under the unfair N.C.G.S. § 75-1.1, the state's unfair or deceptive practices statute. Gray v. North Carolina Ins. Underwriting Ass'n, 352 N.C. 61, 71 (2000); see also Nelson v. Hartford Underwriters Ins. Co., 177 N.C. App. 595, 608 (2006). The statute further provides for treble damages and attorneys' fees. N.C.G.S. §§ 75-16, 75-16.1.

14

As noted above, defendants denied plaintiff's claim on the basis of an honest disagreement. Plaintiff's general characterizations of defendant's actions as "unfair, deceptive, oppressive" (DE 1-1, p. 4) and "arbitrary and unnecessary" (DE 1-1, p. 9) lack support in the record.

Separate and apart from alleging violations of N.C.G.S. § 75-1.1 through §58-63-15, parties may also bring an independent claim under N.C.G.S. § 75-1.1. High Country Arts and Craft v. Hartford Fire Ins., 126 F.3d 629, 635 (4th Cir. 1997). To establish such a violation, plaintiff must show (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs. Gray 352 N.C. at 68. An "unfair" practice is one which "offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Id. (citation and punctuation omitted).

The court awards summary judgment for defendant on this matter, for the same reasons as those provided above. Plaintiffs offer no evidence of the kind of immoral, unethical, oppressive, unscrupulous, or substantially injurious activities targeted by this statute. Instead, defendant reasonably investigated the claim in a timely manner. Furthermore, during its investigation defendant advanced sums to plaintiffs for loss of personal property and alternative living expenses. This does not evidence conduct "manifesting an inequitable assertion of power or position" as plaintiff alleges. Accordingly, the court denies any entitlement to treble damages and attorney's fees arising from this cause of action.

D. Consequential Damages

In their response to defendant's first set of interrogatories, plaintiffs indicated that they intend to present evidence of consequential damages. (DE 23-3). Plaintiffs allege that the claim denial caused damage to their creditworthiness, and forced Steffanie Burch to accept early

15

separation from the Air Force.

Under North Carolina law, an injured party is entitled to be fully compensated for his loss and to be placed as near as may be in the condition which he would have occupied had the contract not been breached. Stanback v. Stanback, 297 N.C. 181 (1979). When an action for breach of contract is brought, the damages recoverable in such an action are those that "naturally flow from the breach, and such special or consequential damages as are reasonably presumed to have been within the contemplation of the parties at the time they made the contract, as the probable result of a breach of it." Johnson v. Railroad Co., 140 N. C. 574, 577, 53 S. E. 362 (1906). Whether special damages arising from the breach of a contract may be regarded as "within the contemplation of the parties," and therefore recoverable, depends upon the information communicated to or the knowledge of the parties at the time and the reasonable foreseeability of such damages. Stanback, 297 N.C. 181; Troitino v. Goodman, 225 N.C. 406 (1945).

In analyzing whether the parties contemplated consequential damages, courts consider whether there existed a specific provision or language in the policy itself permitting recovery of consequential damages, the nature of the contract itself, or whether defendant received communication regarding circumstances or conditions that would presume special damages. Blis Day Spa, LLC v. Hartford Ins. Group, 427 F. Supp. 2d 621, 638 (W.D.N.C. 2006).

In this case, the homeowner policy does not include any provisions speaking to consequential damages. Nor does the nature of the contract–an insurance policy upon a home–suggest that the parties contemplated compensation for losses such as emotional distress, adverse credit effects or loss of employment at the time of formation. Defendant's mere knowledge that plaintiff Steffanie Burch was an active duty service member is not sufficient evidence of the circumstances or

16

conditions necessary to presume special damages regarding her separation from service. Accordingly, the court grants defendant's motion for summary judgment also on plaintiffs' claim for consequential damages.

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is GRANTED in part and DENIED in part in accordance with this order. Defendant's motion for summary judgment as to breach of contract is DENIED. Defendant's motion for summary judgment regarding bad faith, unfair and deceptive trade practices, attorney's fees, treble damages and consequential damages is GRANTED. Plaintiffs' breach of contract claim and defendant's counterclaims remain for trial.

With regard to the case management order issued September 5, 2012, specifying pretrial activities and necessary trial preparation, the parties are directed to file a joint statement setting forth proposed alternative dates for trial, which statement shall reflect consideration also of whether further settlement activities may be appropriate and if so, timing of same. The joint statement shall be submitted within fourteen (14) days of this order.

SO ORDERED, this the 19th day of November, 2013.

_____
LOUISE W. FLANAGAN
United States District Judge

# ADDENDUM A

# HOMEOWNER APPLICATION

**ACORD**

OP ID: SWF
DATE (MM/DD/YYYY): 7/21/2010

EXHIBIT A

| AGENCY | APPLICANT'S NAME AND MAILING ADDRESS (Include county & ZIP+4) |
|---|---|
| PHONE (A/C, No, Ext): 910-323-3045 | STEFFANIE S. BURCH |
| FAX (A/C, No): 910-323-3796 | 108 W. GRAHAM STREET |
| INSURANCE SERVICE CENTER | MAXTON, NC 28364 |
| PO BOX 40736 | Robeson |
| FAYETTEVILLE, NC 28309 | |
| STEPHANIE W. FOLEY, CISR | |

NAIC CODE: 6653
POLICY #:
BINDER #:

DATE AT CURR RES: 
CO/PLAN: LITITZ
HOUSE COPY of ISC OFFICE
HOME PHONE #: 336-233-3819

CODE: SUBCODE:
EFFECTIVE DATE: 07/23/10
EXPIRATION DATE: 07/23/11
BUSINESS PHONE #:

AGENCY CUSTOMER ID: BURCST1

Cu# 12944 #2463

## APPLICANT INFORMATION

PREVIOUS ADDRESS (if less than 3 years):
YRS AT PREV ADDR:
LOCATION OF PROPERTY IF DIFF FROM ABOVE (Inc county & ZIP):

APPLICANT'S OCCUPATION: AIRFORCE E6
APPLICANT'S EMPLOYER NAME AND ADDRESS:
DATE OF BIRTH: 07/07/72
SOCIAL SECURITY #: 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

CO-APPLICANT'S OCCUPATION:
CO-APPLICANT'S EMPLOYER NAME AND ADDRESS:

HOW LONG HAVE YOU KNOWN THE APPLICANT?
DATE AGENT LAST INSPECTED PROPERTY:

## COVERAGES/LIMITS OF LIABILITY

| HO FORM | DWELLING | OTHER STRUCTURES | PERSONAL PROPERTY | LOSS OF USE | PERSONAL LIABILITY EACH OCCURRENCE | MEDICAL PAYMENTS EACH PERSON | PREMIUM |
|---|---|---|---|---|---|---|---|
| 03 | $526,000 | $52,600 | $263,000 | $105,200 | $300,000 | $2,000 | EST TOTAL PREMIUM: $2,463.00 |

DED (Type & Amount): ALL PERIL 500 | WIND/HAIL | THEFT | NAMED HURRICANE * Not Applicable in NC

## ENDORSEMENTS

[ ] REPLACEMENT COST DWELLING  [ ] REPLACEMENT COST CONTENTS  ENTER OTHER ENDORSEMENT(S):

## PAYMENT PLAN

ACORD 610 Attached (NOT APPLICABLE IN NC)

ACCOUNT #:
BILLING: [X] DIRECT BILL  [ ] AGENCY BILL
IF DIRECT BILL: [ ] BILL APPLICANT  [X] BILL MORTGAGEE
IF APPLICANT BILL: [ ] FULL PAY
MAIL POLICY TO: [ ] AGENT  [X] APPLICANT

## RATING/UNDERWRITING

[X] FRAME  MFG HOME  YR BUILT: 1908  # ROOMS  MARKET VALUE: $475,000
STRUCTURE TYPE: [X] DWELLING
USAGE TYPE: [X] PRIMARY
FARM: COC
# FAMILIES: 1
HSEHLD RES:
PURCHASE DATE/PRICE: 07/23/10 $475,000

MASONRY  VINYL SIDING  SQ FT: 5,400  # APTS  REPLACEMENT COST: $526,000
APART / ROWHOUSE / CONDO / CO-OP
SECONDARY / SEASONAL  COMP. DATE:

RENOVATION TYPE:
WIRING X 94
PLUMBING X 94
HEATING X 04
ROOFING X 95
EXTERIOR PAINT

NUMBER OF FIRE DIVS: 
UNITS IN FIRE DIV:
TERR CODE: 47
PREM GROUP: 6
PROTECT CLASS:
DISTANCE TO HYDRANT: 500 FT  FIRE STATION: 3 MI

PROTECTION DEVICE TYPE:
SYSTEM [ ] CENTRAL [X] DIRECT [ ] LOCAL
SMOKE  TEMP  BURGLAR

HEAT TYPE:
PRIMARY: HEATPU
SECONDARY: FIREPL
HOUSEKEEPING CONDITION: G

FIRE/EC RATE:
FIRE DISTRICT/CODE NUMBER: MAXTON FD

DATE HEATING SYSTEM LAST SERVICED:
NUM OF AMPS (ELEC SYST):
CIRCUIT BREAKERS: [ ] YES [ ] NO
FUSES: [ ] YES [ ] NO
KNOB & TUBE OR ALUMINUM WIRING: [ ] YES [ ] NO
PLUMBING SYSTEM CONDITION:
PLUMBING SYSTEM ANY KNOWN LEAKS: [ ] YES [ ] NO
FOUNDATION: [X] CLOSED [ ] OPEN [ ] NONE

DWELLING LOCATION:
[ ] WITHIN CITY LIMITS
[X] WITHIN FIRE DIST
[ ] WITHIN PROT SUBURB

OCCUPANCY: [X] OWNER [ ] TENANT [ ] UNOCC [ ] VACANT
DEADBOLT: Y
FIRE EXT: Y
VISIBLE TO NEIGHBORS: Y

OIL STORAGE TANK LOCATION:
INDOORS / OUTDOORS
ABOVE GROUND ON MASONRY FLOOR
ABOVE GROUND NOT ON MASONRY FLOOR
BELOW GROUND

SWIMMING POOL: YES [X] NO
APPROVED FENCE: N
DIVING BOARD: N
SLIDE: N
ABOVE GROUND: N
IN GROUND: N

WINDSTORM LOSS MITIGATION FEATURES:
Storm Shutters:
Type:
Hurr.Resist.Glass:

BLDG CODE GRADE
INSPECTED? [ ] YES [ ] NO
TAX CODE
RATING CLASS  SPEC
OCCUPIED DAILY? [X] YES [ ] NO
# WKS RENTED
WIND CLASS: [ ] SEMI-RESISTIVE [ ] RESISTIVE [ ] OTHER
ROOF MATERIAL: SHINGLE
CONDITION OF ROOF:

IF REPLACEMENT COST APPLIES, ACORD 42 ATTACHED:
BASEMENT SQ FT
GARAGE SQ FT
BREEZEWAY SQ FT

RATING CREDITS:
[X] NON-SMOKER
[ ] LIGHTNING PROTECTION

MANNED SECURITY
OFF PREMISES THEFT EXCL

SPRINKLER: [ ] PARTIAL [ ] FULL
FIREPLACES (Enter Number):
CHIMNEYS
HEARTHS
PRE-FAB
WOOD STOVE INSERT

## PRIOR COVERAGE

| PRIOR CARRIER | PRIOR POLICY NUMBER | EXPIRATION DATE |
|---|---|---|
| NEW PURCHASE | | |

ACORD 80 (2005/08)  Page 1 of 2  © ACORD CORPORATION 1981-2005